IN THE UNITED STATES DISTRICT COURT IN AND FOR
THE MIDDLE DISTRICT OF FLORIDA
Orlando Division

VICTORY SUPPLY CO., INC.

       Plaintiff,

v.                                      Case No.:

LOCKHEED MARTIN CORPORATION,
*dba* LOCKHEED MARTIN CORPORATION
MISSILES AND FIRE CONTROL,

       Defendant.

_____/

## COMPLAINT

1.     Plaintiff, Victory Supply Co., Inc., ("Victory"), is a Florida corporation, with its principal place of business at 960 Woodcraft Drive, Apopka, Florida 32712.

2.     Defendant, Lockheed Martin Corporation ("Lockheed Martin" or "Lockheed") is one of the world's largest military defense and aerospace contractors, and a publicly traded company with a market capitalization in excess of $116 billion dollars with over 70% of its net sales deriving from contracts with the United States government.

3.     Lockheed Martin is a corporation, organized pursuant to the laws of the State of Maryland and its headquarters and principal place of business is located at 6801 Rockledge Drive, Bethesda, Maryland.

4.     Lockheed is registered to do business in Florida as a foreign for-profit corporation. At all times material hereto, Lockheed Martin operated two (2) facilities of relevance to this lawsuit, one located in Ocala, Florida and the other located in Orlando, Florida. These facilities are referred to as Lockheed Martin Corporation Missiles and Fire Control.

5. Lockheed has purposely availed itself of the laws of the State of Florida, and Victory's causes of action herein directly arise from Lockheed contacts within the State of Florida.

6. This is an action for damages that exceed $75,000.00.

7. Pursuant to 28 U.S.C §1332, this court possesses complete diversity jurisdiction over all parties and the causes of action herein, as well as specific and general personal jurisdiction over Lockheed Martin pursuant to Florida's Long-Arm Statute, §48.193(1) & (2), and all Constitutional due process requirements.

8. Venue in this particular Court is proper to preside over all causes of action raised herein and all parties to this action as the acts and omissions which gave rise to the causes of action herein that damaged Victory all occurred within the greater-Orlando Florida metropolitan area.

9. Victory demands a trial by jury as to all causes of action to which such entitlement is available.

## MATERIAL FACTS

10. Plaintiff, Victory is a local, family owned, product distribution business that has successfully procured various specialized products for private businesses and government entities for more than two decades.

11. In 2008, Lockheed Martin engaged Victory to utilize Victory's own funds to procure, both "active" supplies (items Lockheed uses, consumes, and needs replenished, on a regular basis), and special order "inactive" supplies, (specialized items to be used by Lockheed on an as-needed basis).

12. For approximately eighteen (18) years, Victory relied on Lockheed's continuous representations, including those in an on-line, master contractual agreement containing general terms governing the relationship.

2

13.     Over nearly two decades, this arrangement developed into a binding, consistent course of conduct, establishing mutual expectations and reliance whereby Victory continuously monitored Lockheed Martin's internal inventory levels and deployed its own funds to locate, purchase, and deliver specialized components for Lockheed's sole benefit.

14.     Pursuant to this long-standing course of conduct, Victory routinely initiated and managed vendor pipelines to secure critical material, directly insulating Lockheed from supply chain volatility and manufacturing delays.

15.     Victory procured, received and shipped the "active" supplies to Lockheed's Ocala and Orlando facilities on a bi-weekly basis (twice per week) at Victory's immediate expense.

16.     Upon delivery, Lockheed's authorized personnel inspected the items, reserving the right to accept or reject them.

17.     Once the supplies were accepted and signed for, Victory charged the signed Sales Order (Packing Slip) that invoiced Victory's costs, directly to the corresponding Lockheed  facility's corporate procurement card ("P-Card") within twenty-four (24) hours to reimburse Victory for its out-of-pocket acquisition costs.

18.     Victory neither charged, nor earned any profit from Victory's costs charged to Lockheed to procure the "active" or "inactive" supplies, operating the pipeline as a vital, reliance-based service for Lockheed's sole operational benefit.

19.     This identical operational process governed Lockheed's "inactive" supplies, though on a less frequent basis because the inactive supplies were either subject to a Minimum Order Quantity (MOQ) issue,  and were unique, specialized, and/or not subject to regular consumption or perishing in the manner of active supplies.

20.     Under the parties' agreement and course of conduct, Victory managed the procurement, funding, replenishment, warehousing, and delivery of Lockheed's active and inactive supplies.

3

In exchange for Victory's services, Lockheed paid Victory a predetermined monthly service fee and reimbursed Victory for all actual, out-of-pocket acquisition costs.

21.    For approximately 18 years, Victory relied upon this established operational process, as confirmed by thousands of individual P-Card transactions with Lockheed, utilizing its own capital to procure Lockheed Martin's supplies and essentially functioning as Lockheed's quasi-procurement department.

22.     On April 22, 2025, Lockheed, through its authorized agents, including but not limited to Ashley Beckwith, (Subcontract Management Stf./LM Central Procurement), Salvador Villalobos, Jr. and Jordan M. Medeiros-- informed Victory via email that it would not exercise the remaining option years for the Victory POU contract, thereby ending the current agreement on October 31, 2025.

23.    Despite providing notice of non-renewal, Lockheed directed Victory to continue managing the supplier pipeline, honoring open purchase orders, and processing incoming shipments up through and including the final operational period.

24.    Lockheed acknowledged that the October 2025 non-renewal was not due to any unsatisfactory performance or wrongdoing by Victory. In fact, in an email of April 22, 2025 Lockheed applauded Victory's performance history:

> Although we will not be exercising the option years, we value the services that your company has provided to us.  We appreciate the service and the professionalism that your team has demonstrated, and we are grateful for the support you have provided to our organization. Should any opportunity arise in the future, we hope that you will consider participating in any upcoming competition.

**A true and correct copy of the April 22, 2025, email, titled "Victory Supply Agreement 4400009777 Option Years," is attached hereto and incorporated herein as Exhibit "A."**

25.    In the interim period following Lockheed's April 2025 notice, business continued as usual with Victory continuing to faithfully deploy its own funds to manage, stock, and deliver supplies in accordance with the parties' long-standing course of conduct.

26.    Lockheed personnel, through its authorized agents, including but not limited to Ashley Beckwith, scheduled a Microsoft Teams conference for September 3, 2025, to discuss/create a transition plan to close-out the  Lockheed Victory agreement by the end of October 2025.  The topics mandated by Lockheed for the transition plan included: (a) a structured delivery plan for all remaining warehouse stock to be delivered to Lockheed by October 31, 2025, explicitly to avoid the need to purchase unused inventory or trigger restocking fees; (b) a directive that all invoices must be received by Lockheed  by October 31, 2025; and (c) an inquiry to determine if Victory was holding any material at its warehouse that was no longer actively needed by Lockheed but was being held as a contingency ("just in case") for Lockheed Martin's future operational use.

27.    The conference was immediately followed by an action items email memorializing Lockheed's close-out directives as discussed.

**A true and correct copy of the September 3, 2025, emails, titled "Victory Material Transition Meeting," are attached hereto and incorporated herein as Exhibit "B."**

28.    On or about September 11, 2025, Lockheed abruptly altered its close-out directives and restricted Victory's access to its facilities. Victory immediately contacted Lockheed's  authorized agents to express its deep concern over the sudden operational changes and the financial impact on its supply chain. Highlighting the extreme detriment caused by Lockheed's unexpected conduct, Victory informed Lockheed:

> We understand we are "not to deliver to the cabinets". So, if there are no cabinets, and we are not to go to the departments, how are we supposed to know what is required for the next delivery? I am a bit confused. As we discussed, we had been ordering with 10/31 as the end game, but the goal posts were moved unexpectedly. We cannot cancel these PO's, and we will need to pay our vendors, so this transition leaves me concerned. I am

happy to follow directions but not to the detriment of my vendors not getting paid because of unexpected changes. We have been so fortunate to have had this contract for 17 years and are extremely grateful for the wonderful people we were privileged to work with in the past. With 17 years invested, winding it down in such a short window with the dates being revisited, leaves me a bit concerned. Please advise/clarify.

**A true and correct copy of this email is attached hereto and incorporated herein as Exhibit "C."**

29.     On September 15, 2025, Ashley Beckwith issued further written directives to Victory's management confirming that she and Ed Eurell (Compliance / Vendor Liaison) would arrive at Victory's facility the following day, September 16, 2025, to dictate a **different** plan for Orlando material deliveries. In this communication, Lockheed explicitly exerted operational control over Victory's business and inventory, instructing Victory to hold all scheduled deliveries and stating:

> Hi Margie,
> Ed and I are planning to come to Victory tomorrow 9/16/25 at 11am to discuss the plan for Orlando material deliveries. I think this is the best way to communicate moving forward.
>
> Jimmy,
> Please hold off on deliveries for tomorrow until after we meet. Also, please note that Victory should no longer be placing new orders for material. LM would like you to only replenish inventory from your warehouse.

**A true and correct copy of this September 15, 2025, email is attached hereto and incorporated herein as Exhibit "D."**

30.     On September 16, 2025, Lockheed's authorized agents, including Ashley Beckwith and Ed Eurell, conducted a formal physical inspection of the active and inactive supplies stored at Victory's warehouse facility.  The personnel conducting this inspection included the specific Lockheed contract administrators with whom Victory worked closely and directly for several years.

31.    Through their designated roles, titles, and past interactions with Victory, Victory reasonably believed that these agents were legally empowered to bind Lockheed  to modifications, instructions, and agreements made during the wind-down and inspection process.

32.    Accordingly,  Victory reasonably believed these agents possessed the complete authority to amend the parties' agreements, alter the established course of conduct, and manage the final inventory close-out.

33.    During the September 16, 2025, physical inspection, these Lockheed agents directed Victory to package, palletize, and shrink-wrap the inventory, to attach detailed packing slips to each pallet, and to ship the materials directly to the Lockheed Martin locations in Ocala and Orlando, Florida.

34.    Lockheed's agents further instructed Victory to issue separate invoices for each individual shipment and explicitly promised that Lockheed would pay each invoice immediately upon receipt.

35.    Explicit delivery schedule instructions and payment terms were subsequently memorialized in email communications between Lockheed  and Victory. A September 16, 2025, email from Ashley Beckwith outlined **the new** transition plan for inventory delivery from Victory, and confirmed that deliveries and invoicing for certain purchase orders would extend into November, past the contract's October 31, 2025, expiration date.

36.    Lockheed's summary instructed Victory to continue supplying materials, authorized a shift in billing override commitments, and promised payment for September and October 2025 services regardless of  reduced delivery frequency.

**A true and correct copy of this September 16, 2025, email from Ashley Beckwith is attached hereto and incorporated herein as Exhibit "E."**

7

37.     Victory relied upon these terms to comply with and fully fulfill its obligations exactly as instructed by Lockheed Martin personnel.

38.     On September 17, 2025, a critical internal disconnect within Lockheed became apparent when Colin P. Frederick (Senior Manager, Production Planning at Lockheed Martin) issued an urgent email to Victory management stating that the OCC was depleting critical materials so rapidly that they "would've been shut down today if not for borrowing from other areas/cabinets." Lockheed's personnel explicitly demanded that Victory restock the facility on an emergency basis with "green and black band gloves" and "1010 wipes" as soon as possible.

39.     Later that afternoon on September 17, 2025, Ashley Beckwith intervened via email, copying multiple Lockheed  and Victory personnel, and admitted that Lockheed  was responsible for any logistical confusion and pipeline delay, explicitly stating:

> "Victory is not [to] blame as we have given them instructions for delivery
> over the next few weeks."

**A true and correct copy of this September 17, 2025, email chain, which also details Lockheed Martin's "2025 Year End Blackout Dates," is attached hereto and incorporated herein as Exhibit "F."**

40.     The September 17, 2025 admission by Lockheed's authorized agent conclusively establishes that Victory was operating at all times under the authorized command of Lockheed's agent Ahsley Beckwith, and that any supply chain friction or delivery holds were the direct consequence of Lockheed's uncoordinated internal transition issues, rather than any fault, delay, or performance failure by Victory.

41.     In reliance upon Lockheed's explicit acknowledgments and directives of September 16, 2025, to manage deliveries and payments over the final weeks, Victory continued to act in good faith, deploying its own funds to finalize and pay outstanding vendor purchase orders to ensure specialized inventory was delivered for Lockheed's sole benefit.

42.     On September 23, 2025, Lockheed also confirmed that its September 16, 2025 transition plan would result in larger invoice amounts than usual in order for Victory to comply with Lockheed's plan, and Lockheed represented that it would pay those amounts due. To that end, Victory requested detailed instructions on how to handle the financial surge, stating:

> Could we get more detailed instructions on where to submit higher dollar amount invoices? We will talk to Paul about credit card limits as Victory delivers excess inventory.

43.     In immediate response, Ashley Beckwith  promised that Lockheed had established an internal protocol to override standard card limits to ensure Victory was reimbursed for the excess inventory, stating:

> Yes, Liz is able to approve more per month for invoices she will just need the required documentation to approve going over her limit. @Gase, Elizabeth R (US) let us know if you need anything else from victory to approve invoices past the monthly pcard limit.

**A true and correct copy of this September 23, 2025, email chain is attached hereto and incorporated herein as Exhibit "G."**

44.     Thus, as  of September 23, 2025, Lockheed directed Victory to deliver its remaining stock, acknowledged that these final deliveries would exceed standard credit card caps, and promised that its authorized agent, Elizabeth ("Liz") Gase, possessed the authority to approve and process the high-dollar invoices.

45.     On October 1, 2025, however, Lockheed reneged  on its explicit delivery representations. Ed Eurell sent a directive to Victory, copying Ashley Beckwith, stating:

> Please do not deliver remainder of items to Orlando that is left in warehouse until Ocala has completed transition. Bridget will be contacting you regarding further deliveries to Ocala. We (Orlando) will set a TBD date later this month for remainder of the materials left in warehouse to be delivered to Orlando / Ocala after all installs have been completed.

**A true and correct copy of this October 1, 2025, email is attached hereto and incorporated herein as Exhibit "H."**

9

46.     This October 1, 2025, directive shows that Lockheed explicitly ordered Victory to store and hold specialized pipeline items in its warehouse under an indefinite "*To Be Determined*" timeline, which contradicts Lockheed's earlier representations that all deliveries and invoices would be satisfied by the contract end date of October 31, 2025.

47.     In compliance with this hold order, Victory maintained the specialized inventory in its warehouse using its own funds to do so.  Victory did this while keeping the manufacturer pipelines open for the components Lockheed had previously committed to accept and reimburse Victory's costs.

48.     Next, on Thursday, October 2, 2025, Lockheed reneged on its explicit payment representations.  Lockheed's Procurement Representative, Elizabeth ("Liz") Gase issued a high-importance email to Victory, unilaterally altering Lockheed's established payment processing representations of September 16 and September 23, 2025, which Victory had relied upon.

49.     This directive was copied to eight (8) other Lockheed Martin personnel, including Isabela A. Coutinho, Ashley Beckwith, Paul A. Slocum, Kimberly Rung, Jordan M. Medeiros, Ed Eurell, Bridget D. Bettis, and Marguerite C. Albright.  In this directive, Lockheed stated:

> "As of today, no further charges can be charged to my card ending in 3641 for Victory Cabinet orders for both Ocala and Orlando."

50.     Lockheed also changed its point of contact for financial settlement, instructing Victory:

> "Moving forward, all charges will be paid by @Coutinho, Isabela A (US). Please reach out to Isabela directly."

51.     Lockheed further altered the established course of dealing, and materially reneged on its prior representations of September 16th and the 23rd, by imposing strict pre-conditions on any payment, stating:

> "Invoices and Blue Copies will be required before charges will be approved and the CC# will be provided over the phone for each order at the time of payment processing."

**A true and correct copy of this October 2, 2025, email is attached hereto and incorporated herein as Exhibit "I."**

52.     This new payment requirement directly contradicted the long-established course of conduct and the express terms governing the parties' financial transactions. Specifically, pursuant to Section 6(c)(iii) of the Statement of Work ("SOW"), Lockheed Martin was contractually obligated to provide a Procurement Card ("P-Card") to Victory within twenty-four (24) hours of receiving a billed invoice.

53.     By unilaterally revoking the authorized P-Card ending in 3641 and conditioning future payments on a manual, order-by-order telephone process, Lockheed Martin breached Section 6(c)(iii) of the SOW, and the payment process agreed upon pursuant to Ashley Beckwith's emailed representations on behalf of Lockheed on September 16, 2025 and September 23, 2025.

54.     Notwithstanding, Lockheed's October 2, 2025,  communication is an admission  of Lockheed ongoing financial obligation for "Cabinet orders" and set up a  new, specific billing pipeline (via Isabela Coutinho) to process those payments just weeks before the final October inspections and delivery dates.

55.     Despite Lockheed's effort of October 2, 2025, to avoid payment, Victory continued to fully perform its obligations in good faith, preparing the inventory and scheduling the final close-out meetings, reasonably believing that Lockheed would ultimately pay its debts by reimbursing Victory for its out of pocket costs incurred at Lockheed's request and for its own  benefit.

56.     On October 8, 2025, Victory complied with Lockheed's new billing directives by submitting the Ocala invoices directly to Procurement Representative Isabela Coutinho, with copies to other Lockheed Martin personnel.

57.   Upon receiving no response or payment within Lockheed's newly mandated 24-hour window, Victory followed up with Ashley Beckwith on October 13, 2025, attaching the outstanding manifests for Ocala and requesting guidance on any further steps required to secure payment.

58.   On October 15, 2025, Ashley Beckwith admitted receipt of Victory's invoices for Ocala deliveries but came up with the pretextual excuse that the files had been "stuck in [her] outbox due to size" since the preceding Monday. Thus, Lockheed failed to comply with its own 24-hour P-Card payment obligation under Section 6(c)(iii) of the SOW.

60.   As of October 23, 2025—more than two weeks after Victory's initial invoice submission—Lockheed still had not processed payments, prompting Victory to issue an urgent written plea noting that manifests dated back to August 2025 and that Victory was in "dire need of attention to this."

61.   Minutes later, Isabela Coutinho would only "confirm that [she had] all invoices for the charges authorized before providing the full card number" and refused to provide Victory with the P-Card number, necessary to process payment.

62.   This deliberate withholding of the P-Card number directly violated Section 6(c)(iii) of the SOW, which mandated payment within 24 hours of a billed invoice, and exposed a bad-faith, intentional effort to delay financial settlement despite Victory's continuous, compliant performance.

63.   Despite Isabela Coutinho's promise to review the files on October 23, 2025, Lockheed continued to withhold the mandatory P-Card payment details, forcing Victory to carry the substantial financial burden of the completed orders for weeks.

**A true and correct copy of this October 8, 2025, email is attached hereto and incorporated herein as Exhibit "J."**

64.     Lockheed  failed to issue payment for these outstanding Ocala invoices until November 6, 2025, nearly one month after Victory's initial October 8 submission. By delaying payment until November 6, 2025, Lockheed materially breached Section 6(c)(iii) of the SOW, which explicitly required P-Card payment within twenty-four (24) hours of a billed invoice. Lockheed's representations and conduct on September 16, September 23, and October 2, 2025 did not alter or change the 24 hour deadline to pay Victory.

65.     Lockheed's systematic payment delays and administrative obstruction disrupted Victory's cash flow, forcing Victory to operate under extreme financial duress while continuing to fulfill Lockheed Martin's close-out demands in good faith.

66.     On October 9, 2025, Ashley Beckwith initiated written contact with Victory to schedule "one last visit" to finalize the excess inventory close-out. In that communication, Ashley Beckwith explained that the purpose of the meeting was to "discuss excess inventory and any outstanding items," further confirming that Lockheed was actively managing and resolving the inventory pipeline through her.

67.     The meeting took place at Victory's facility on October 21, 2025 to accommodate the schedules of Ms. Beckwith, and Lockheed's Compliance/Vendor Liaison, Ed Eurell. **A true and correct copy of this October 9, 2025 "Visit" email is attached hereto and incorporated herein as Exhibit "K."**

68.      During the October 21, 2025, meeting,  Lockheed's agents reviewed Victory's shrink-wrapped palletized packaged inventory with coordinating pack slips attached for Ocala (15 pallets) and Orlando (15 pallets), conforming exactly to the packaging and labeling instructions previously issued by Lockheed.

69.     That same day, Lockheed's Ed Eurell, emailed Victory and Lockheed's sub-contract management staff, and directed Victory to deliver the remaining Orlando inventory—consisting of approximately fifteen (15) pallets—on Tuesday, October 28, 2025. Eurell's email memorializes

13

the verbal representations, agreement, instructions, and course of conduct established during Lockheed's October 21, 2025, physical inspection of Victory's facility.

**A true and correct copy of this email is attached hereto and incorporated herein as Exhibit "L."**

70.    Victory reasonably relied upon this explicit written representations, which confirmed Lockheed 's obligation to accept the final fifteen (15) pallets of Orlando inventory and pay the corresponding invoices upon receipt.

71.    On October 24, 2025, Victory emailed Lockheed personnel—including Ed Eurell and Clive A. Lynch—notifying them that an unexpected purchase order with a long lead time had arrived early and was prepared for immediate delivery.

72.    In that communication, Victory confirmed that a Lockheed representative named "Drew" had already directed Victory to transport and deliver the materials directly to Lockheed shipping and receiving area.

73. Ed Eurell responded directly to Victory's email, stating:

> "Thank you for letting me know Jimmy, I must leave at 12:30, Receiving will be open for this delivery."

**A true and correct copy of this October 24, 2025, email is attached hereto and incorporated herein as Exhibit "M."**

74.    By confirming that the "Receiving" department would remain open to accept the incoming cargo, Lockheed's agent Ed Eurell, authorized the delivery and reaffirmed Lockheed's commitment to accept Victory's inventory and reimburse Victory's costs paid for such.

75.    On October 27, 2025, Lockheed's Ashley Beckwith sent an urgent, high-importance email to Victory, copying Jordan M. Medeiros, stating:

> "What time are you available for a call today? The site has expressed concerns about recent material charges."

14

**A true and correct copy of this October 27, 2025, email is attached hereto and incorporated herein as Exhibit "N."**

76.    That same day, and the night before Victory's scheduled final delivery to Lockheed— Ashley Beckwith issued another email completely reversing and reneging on Lockheed's previous inventory close-out mandates and representations.

**A true and correct copy of this October 27, 2025, email is attached hereto and incorporated herein as Exhibit "O."**

77.    Citing Sections 14(a)–(b) and Section 10(c) of the SOW, Lockheed now claimed that its obligation was capped at purchasing a mere two (2) weeks of stock, and demanded Victory to instantly produce extensive consumption data and a disposition plan for any excess materials.

78.    In that same communication, Lockheed threatened to reject and demand refunds for previously delivered materials, stating it was actively reviewing inventory to return items back to Victory.

79.    This last-minute, after-hours mandate directly contradicted weeks of explicit representations, instructions, verbal agreements, and written directives issued by Ashley Beckwith and Ed Eurell during and pursuant to their September 16 and October 21, 2025, on-site warehouse inspections, which Victory had reasonably relied upon. This unconscionable delay left Victory with thirty (30) fully prepared, shrink-wrapped, and palletized close-out items that Lockheed had already ordered and approved, which Victory paid for; (15) of which were designated for Orlando, and Ocala's pallets were delivered upon request, signed for, and invoiced. However, they remain unpaid, and no refusals or returns were requested within the 60-day contractual terms.

80.     On October 29, 2025, Victory emailed Lockheed personnel (Clive "Drew" Lynch) to coordinate the immediate delivery of incoming components. These components had been funded by Victory in reliance on Lockheed's mandated close-out process. Victory's email stated:

> Victory has a PO that came in for: 09701355 - Ta2O5-1007 to fit 42mm jeol crucible liner interior U/M EACH…30 each and Jimmy needs to deliver it in the a.m. Additionally, there are three other PO for y'all and all were scheduled for mid-November delivery before we were aware of the changes. These are: 04013010 – WITNESS CHIPS …10 BX, 09700898-0 - WAFER…30 EACH, 09701777-0 – SPONGE 333-5077…100 EACH. Jimmy will let you know when these arrive and get them to you immediately.

81.     Lockheed responded to Victory the next morning, shifting responsibility back to corporate compliance by stating, "Good morning jimmy might need to contact Ed Eurell about these items."

82.     Shortly thereafter, Ed Eurell sent the following internal directive to Lockheed's Colin P. Frederick, copying Ashley Beckwith:

> "Drew contacted me this morning regarding the e-mail Victory sent him. I relayed to Drew to not communicate to Victory in any way from this point on and not to accept any direct deliveries from Victory. In addition, if he is to receive any further correspondence to forward (not reply) those e-mails to Myself and Ashley. May I suggest that we revoke Victory's access to both Orlando and Ocala sites at this time, if not already done so."

83.     The October 29-30, 2025, email chain evidences Lockheed's intentional bad-faith procurement representations of 9/16, 9/25, 10/1, 10/21 and 10/24, 2025, to induce Victory to use its own funds to benefit Lockheed when Lockheed had no intention of complying with its own representations. It shows that while Victory was actively attempting to deliver specialized, non-cancelable components ordered and paid for at Lockheed's command, the same Lockheed personnel who made those representations secretly ordered personnel to cut off all communication, refuse all direct deliveries, and revoke Victory's physical access to the facilities. These actions occurred one day before the contract expiration date leaving Victory immediately exposed to massive third-party vendor liabilities.

16

**A true and correct copy of this October 29–30, 2025 internal email chain is attached hereto and incorporated herein as Exhibit "P."**

84.    On Thursday, October 30, 2025, Victory formally rejected Lockheed's final bait-and-switch directive via email, stating that the newly imposed, retroactive demands were completely "unattainable" at such a late stage. Victory also detailed the catastrophic operational and financial damage caused by Lockheed's conduct:

A.  Victory was actively closing and moving out of its warehouse facility based entirely on Lockheed Martin's close-out plan.

B.  Lockheed Martin was actively refusing fresh deliveries of custom parts ordered specifically for OCC.

C.  Lockheed Martin had completely withheld payments for deliveries spanning August, September, and October 2025 despite continuous, repeated pleas.

**A true and correct copy of this October 30, 2025 email chain is attached hereto and incorporated herein as Exhibit "Q."**

85.    As a direct consequence of Lockheed's conduct, Victory was placed under severe financial duress. The company was forced to carry the cost of custom supplier inventory, which severely disrupted vendor relationships and directly threatened its corporate payroll.

86.    Also in October 2025, in accordance with the transition window directives, Victory received and attempted delivery of Item 09701355 (Ta2O5-1007 crucible liners to fit 42mm JEOL crucible liner interior, 30 each) for an invoice total of $18,497.10. In direct violation of the agreed close-out plan and the parties' 18-year course of performance, Lockheed Martin personnel improperly refused to accept the delivery, leaving Victory immediately exposed to the third-party manufacturing vendor for the full cost of the inventory.

87    On November 4, 2025 Victory issued an urgent email to Lockheed's Ed Eurell, formally protesting Lockheed Martin's sudden, uncoordinated, and legally improper reluctance to accept these contracted items. Therein, Victory detailed multiple active, outstanding purchase orders

("POs") arriving from vendors for Lockheed's account, including specific high-priority components:

A.      One PO for the Ocala Facility: Partial delivery of Witness Chips (Item 04013010-WITNESS CHIP) and Item 09701355.

B.      Three PO's for the Orlando Facility: Witness Chips (Item 04013010, 10 boxes), Wafers (Item 09700898-0, 30 each), and Sponges (Item 09701777-0, 100 each), all promised for mid-November 2025 delivery.

88.    Victory also warned Lockheed of the severe financial distress its refusal was causing, stating:

"It is not right to refuse these, we owe our vendors, and this puts us in an unnecessary position."

89.    On the same day, Ed Eurell responded, copying multiple Lockheed personnel including Ashley Beckwith, Colin P. Frederick, and Jordan M. Medeiros, and admitted that Lockheed was withholding processing valid Victory purchase orders, stating:

"We are working to get approval to accept these orders. Please could you provide the total cost for all items below."

**A true and correct copy of the November 4-5, 2025, email exchange is attached hereto and incorporated herein as Exhibit "R."**

90.    The total outstanding cost for the items improperly withheld, refused, or delayed by Lockheed Martin equals $43,058.30, which breaks down into the following outstanding line items:

A.      Orlando Facility PO's: $41,272.31 total (comprising $525.21 for the initial delivered Witness Chip box, $18,497.10 for the refused crucible liners, $12,900.00 for the wafers, and $9,350.00 for the sponges).

B.      Ocala Facility PO: $1,785.99 for custom-made, non-cancelable Connector Caplugs (Item 09700751-O) scheduled for delivery 11/14/25.

91.    On November 11, 2025, following multiple unreturned communications regarding the open pipelines and outstanding amounts due, Victory issued an urgent, high-importance

18

demand via email to Lockheed's Ashley Beckwith, Ed Eurell, Colin P. Frederick, and Jordan M. Medeiros. Victory stated:

> "I sent this request out yesterday and received -0- responses. Victory needs information on payments due us immediately."

**A true and correct copy of this November 11, 2025, email chain is attached hereto and incorporated herein as Exhibit "S."**

92.    That same day, Victory issued another high-importance email directed to Ed Eurell, copying Jordan M. Medeiros, Ashley Beckwith, and Colin P. Frederick, stating:

> "Ed, We need to deliver these items. They are specific to LM and cannot be returned. We need to deliver these 11/12/25."

**A true and correct copy of this November 11, 2025, email is attached hereto and incorporated herein as Exhibit "T."**

93.    Notwithstanding, Lockheed refused to permit the deliveries, maintained its payment freeze, and left Victory completely stranded, holding and maintaining massive out-of-pocket of specialized, non-cancelable inventory ordered exclusively for Lockheed at Victory's principal facilities, and at Victory's expense.

94.    In spite of its own inventory close-out and payment representations, Lockheed continues to refuse to accept the third shipment or reimburse Victory for its out-of-pocket costs incurred in purchasing those supplies on its behalf.

95. Instead, Lockheed, through its in-house legal department, has fabricated false reasons and excuses for not complying with its own close out directions, representations, and agreement relied upon by Victory; and has not paid its invoices for the previous procurement and delivery of supplies Lockheed accepted prior to the inventory close-out and payment representations.

96.    As the direct and proximate consequence of Lockheed's conduct, Victory has been denied reimbursement of no less than $642,132.12 for its own out of pocket costs incurred to

purchase the Lockheed supplies, the value of the use of those funds, and has incurred otherwise unnecessary warehousing and labor costs to maintain the supplies while Lockheed's refusal to pay remains pending. Victory has also been forced to retain legal counsel to pursue its rights and remedies.

## COUNT 1: FRAUDULENT INDUCEMENT

97.    Victory adopts and incorporates in full allegations within paragraphs 1-96 above as if fully re-alleged herein.

98.    On 9/16/2025 9/25/2025, 10/1/2025, 10/21/2025 and 10/24/2025 and again on 11/04/2025, Lockheed Martin, through its authorized agents, including but not limited to Ashley Beckwith, and Ed Eurell intentionally made false statements of material facts to Victory.  These false representations were made during onsite walkthroughs of the supplies, as well as in follow-up email communications and telephone conferences.   Specifically, Lockheed Martin represented that it would reimburse Victory's cost of goods for all active and inactive supplies stored at Victory's facility, if Victory separated, packaged, palletized, wrapped each pallet with packing slips attached and delivered those supplies between the Ocala and Orlando branches in separate shipments, and separately invoiced each shipment.

99.    In direct reliance on these explicit written and verbal directives, Victory completely altered its position, exhausted its warehouse resources, and expended intensive, uncompensated labor to meticulously separate, pack, wrap, and affix individual packing slips to the pallets exactly as Lockheed instructed. Victory would not have undertaken this burdensome administrative and physical segregation but for Lockheed's express representations that all such inventory would be fully reimbursed.

20

100.   At the time Lockheed Martin made these representations, it knew them to be false and had no intention of accepting or reimbursing Victory for its costs of goods for each of the Ocala and Orlando shipments.

101.   Rather, Lockheed knowingly engaged in a deceptive scheme to defraud Victory. Lockheed required the active and inactive supplies in Victory's inventory solely to restock and maintain its own operational inventory on an interim basis until it implemented a transition of its procurement services away from Victory to a third-party provider.

102.   When Lockheed accepted Victory's initial shipments for the Ocala branch, its interim inventory needs were fully satisfied. Consequently, Lockheed executed its predetermined plan and refused to accept or pay for the Orlando shipment, leaving Victory with stranded inventory and unrecouped costs.

103.   Victory has been directly, proximately and foreseeably damaged as a result of Lockheed Martin's intentional, false representations and Victory's justifiable reliance thereon.   These damages include, but are not limited to, the unpaid cost of goods, specialized packaging and handling costs, warehousing fees, and lost alternative commercial opportunities, in any amount. At the beginning of September 2025, Lockheed Martin personnel, through its authorized agents, including but not limited to Ashley Beckwith (Subcontract Management Stf./LM Central Procurement), scheduled a formal Microsoft Teams conference for September 16, 2025, to discuss and create an inventory close-out and delivery plan as the October 31, 2025, expiration of the Victory Agreement approached. The topics mandated by Lockheed Martin for this conference included establishing the logistical parameters for the final transfer of Victory's stored warehouse inventory.

WHEREFORE, Victory Supply Co, Inc., demands judgment for damages against Lockheed Martin Corporation for Fraudulent Inducement, together with an award of

compensatory damages, pre-judgment and post-judgment interest, costs of this action and any such other legal or equitable relief to which it is entitled as a matter of law and/or equity, including punitive damages upon amendment to this pleading pursuant to §768.72, Florida Statutes.

## COUNT 2:  BREACH OF FIDUCIARY DUTY

104.    Victory adopts and incorporates in full the allegations within paragraphs 1- 96 above as if fully re-alleged herein.

105.    Over the course of an uninterrupted 18-year relationship, the parties moved past an arms-length commercial arrangement. Lockheed Martin induced Victory to repose unique trust, confidence, and total reliance in Lockheed's corporate mandates. In doing so, Lockheed created and accepted a fiduciary and quasi-agency relationship with Victory.

106. Under this relationship, Victory effectively operated as Lockheed's de facto internal procurement department. Lockheed dictated inventory levels and pipeline management, and expressly induced Victory to advance its own independent capital at a 0% profit margin solely to protect Lockheed's sovereign defense supply chain from market volatility.

107.    Lockheed Martin created a fiduciary relationship with Victory, whereby Victory entrusted its funds to be used for Lockheed's benefit, based upon Lockheed's duty to reimburse those funds upon receipt of the supplies satisfactorily procured and shipped to and accepted by Lockheed.

108.    Concurrently, Victory entrusted its corporate funds to be used for Lockheed's operational benefit. This trust was reposed based upon Lockheed's explicit, mutual acceptance of a duty to immediately reimburse those advanced funds upon the structural delivery of the supplies to the designated Ocala and Orlando parts cabinets.  Victory used its funds to procure the Lockheed

supplies; Lockheed agreed to and approved the process for shipment, receipt, and payment for the supplies; and, then reneged on its duty to accept or pay for the final shipment of those supplies.

109.    Lockheed did so in bad faith, as evidenced by instructing Victory to not even ship the last shipment prior to its receipt and inspection of the goods,  and placed its interests before those of Victory in spite of the fiduciary obligation Lockheed possessed to not act contrary to, or at the expense of, the fiduciary relationship with Victory.

110.    Once Victory had fully exposed its capital and resources, Lockheed breached its fiduciary duties. Lockheed acted in bad faith, placed its own economic interests entirely ahead of Victory's, and active-aggressively abused the trust it had cultivated over nearly two decades. Specifically, Lockheed unilaterally reneged on its duty to reimburse Victory, revoked Victory's administrative system access, and abruptly ordered Victory not to ship the final remaining procurement run— despite knowing Victory had already exhausted its capital to secure those components at Lockheed's express direction.

111.    Lockheed's breach of fiduciary obligations was committed with willful, wanton, and reckless disregard for Victory's financial stability, deliberately shifting its own transition costs and supply-chain exposure onto its trusting partner.

112.    Victory has been substantially and directly damaged as a direct and proximate result of Lockheed's bad faith breach of its fiduciary obligations.

WHEREFORE, Victory Supply Co, Inc., demands judgment against Lockheed Martin Corporation for Breach of Fiduciary Duty, and an award of all legal damages and equitable relief to which it is entitled as a matter of law and/or equity, including punitive damages upon amendment to this pleading pursuant to §768.72, Florida Statutes.

### <u>COUNT 3:  BREACH OF CONTRACT</u>

113.    Victory adopts and incorporates in full the allegations within paragraphs 1-96 above as if fully re-alleged herein.

114.    Lockheed Martin and Victory entered into a contract with each other, memorialized in written documents, e-mail communications, and the parties' long standing course of conduct.

115.    Victory performed its material obligations pursuant to the parties' contract, or Lockheed excused such performance.

116.    Lockheed Martin materially breached the parties' contract without excuse or justification.

117.    Victory has been damaged as a direct and proximate result of Lockheed's breach.

WHEREFORE, Victory Supply Co, Inc., demands judgment against Lockheed Martin Corporation for Breach of Contract, and an award of all legal damages and equitable relief to which it is entitled as a matter of law and/or equity.

## COUNT 4:  PROMISSORY ESTOPPEL

118.    Victory adopts and incorporates in full the allegations within paragraphs 1- 96 above as if fully re-alleged herein.

119.    Lockheed Martin made a promise to Victory which Lockheed knew or reasonably should have known Victory would rely upon.

120.    Victory reasonably relied on Lockheed's promise and took action pursuant to Lockheed's promise.

121.     Injustice will occur if the Court does not enforce Lockheed's promise.

WHEREFORE, Victory Supply Co, Inc., demands judgment against Lockheed Martin Corporation for Promissory Estoppel, and an award of all legal damages and equitable relief to which it is entitled as a matter of law and/or equity.

## COUNT 5:  QUANTUM MERUIT

24

122.   Victory adopts and incorporates in full the allegations within paragraphs 1- 96 above as if fully re-alleged herein.

123.   Victory provided valuable services and materials to Lockheed Martin.

124.   Lockheed Martin requested and accepted the benefits of Victory's services and materials.

125.    Victory reasonably expected to be re-imbursed for its materials, and Lockheed knew or should have known of Victory's expectation.

126.   It would be unfair or inequitable for Lockheed to retain the benefit of those materials without compensating Victory the fair market value of such, i.e., reimbursing Victory its costs.

WHEREFORE, Victory Supply Co, Inc., demands judgment against Lockheed Martin Corporation for Quantum Meruit, and an award of all legal damages and equitable relief to which it is entitled as a matter of law and/or equity.

## COUNT 6: UNJUST ENRICHMENT

127.   Victory adopts and incorporates in full the allegations within paragraphs 1- 96 above as if fully re-alleged herein.

128.   Victory directly provided a benefit to Lockheed Martin, i.e., procurement of and access to active and inactive supplies when needed.

129.   Lockheed Martin was aware of the benefit at all times relevant.

130.   Lockheed Martin voluntarily accepted or retained the benefit at all times relevant.

131.   Under the circumstances, it is unjust to allow Lockheed to keep the benefit without paying for it, i.e., reimbursing Victory its costs.

WHEREFORE, Victory Supply Co, Inc., demands judgment against Lockheed Martin Corporation for Unjust Enrichment, and an award of all legal damages and equitable relief to which it is entitled as a matter of law and/or equity.

*Murray Hudson*

_____

G. Murray Hudson, Esq.
Fla. Bar # 788503
Hudson Law, PLLC
5255 N. Federal Hwy #318
Boca Raton, FL 33487
(561) 448-2703
Hudsonlawgrp.com
murray@murrayhudsonlaw.com
vr@Murraryhudsonlaw.com

Counsel for Victory Supply Corporation, Inc.

26